In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3526

CHARLES GREENHILL and AMPHIB, INC.,

*Plaintiffs-Appellees,*

*v.*

RICHARD M. VARTANIAN and PLATINUM FIGHTER SALES, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-cv-09585 — **John Robert Blakey**, *Judge.*

ARGUED FEBRUARY 4, 2019 — DECIDED MARCH 8, 2019

Before WOOD, *Chief Judge*, and EASTERBROOK and ST. EVE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Hermann Göring, head of the Luftwaffe in World War II, remarked: "When I saw those Mustangs over Berlin, I knew that the war was lost." The P-51 Mustang fighter entered service in January 1942, and long-range variants introduced late in 1943 could escort Allied bombers to Germany and back. (With external fuel tanks, they had a range exceeding 1,600 miles.) More than

15,500 Mustangs were built; the plane served as this nation's main fighter until jets succeeded it during the Korean War. Some Mustangs remained in military use in other nations until 1984. The picture below shows one of the long-range versions. Surviving aircraft are collector's items, "warbirds" lovingly rebuilt and maintained by private aficionados, displayed in museums, and occasionally flown at air shows. One is in the collection of the Smithsonian's National Air and Space Museum. The Federal Aviation Administration has more than 100 airworthy Mustangs on its register today. This suit is about one of them—or perhaps two of them.



In 1965 Richard Vartanian bought a Mustang that had flown in the Royal Canadian Air Force but had been in private hands since 1960. Its serial number was 44-74543. He stored it at a car dealership until 1973 or 1974, when he moved it to a hangar at Fulton County Airport in New York. In 1985 Vartanian decided to move the plane to California, but his representative could not find it. Vartanian suspected Wilbur Martin, who had promised to restore the plane on Vartanian's behalf. In April 1985 Vartanian's lawyer de-

manded that Martin return the plane and, when that did not occur, Vartanian personally complained to the FAA, the FBI, and law-enforcement agencies in Los Angeles, Chicago, and New York that the plane may have been stolen.

Martin denied taking Vartanian's plane but conceded buying some Mustang parts from Waterman Brown, one of Vartanian's associates. Martin later registered with the FAA (which administers the federal system of aircraft ownership) a Mustang having serial number 44-63655. Martin asserts that it had been cobbled together using parts from a plane of his that had crashed in Nicaragua plus components that he had acquired from several sources, including Brown.

In 1998 Martin sold the plane bearing SN 44-63655 to Amphib, Inc., a corporation controlled by Charles Greenhill. Vartanian learned about this transaction in 2002 or 2003 by reading an article in *Air Classics* magazine that incorrectly identified the serial number of Greenhill's plane as 44-74543 (which, recall, had been attached to Vartanian's plane) and specified its provenance as one that the Royal Canadian Air Force had sold as military surplus. In 2004 Vartanian hired another lawyer to investigate. He obtained the FAA's file on the plane, which showed the sale to Greenhill in 1998, and prepared the complaint for a tort action against Martin and Greenhill. But this lawyer died before filing the suit, and Vartanian did not follow up.

In 2009 Vartanian wrote a letter to the United States Attorney for the Northern District of Illinois contending that his Mustang had been stolen by Martin in 1984 and that Martin used the serial number of the plane destroyed in Nicaragua to conceal his crime. The United States Attorney declined to prosecute but urged Vartanian to retain counsel to

pursue civil relief. Vartanian did nothing further until after learning from a historian in 2013 that there were irregularities in the serial numbers of several of Martin's planes. In February 2014 Vartanian sent Greenhill a letter demanding that he turn over the plane purchased from Martin. Greenhill responded in 2015 with this suit under the diversity jurisdiction, seeking a declaratory judgment that he owns the plane. Vartanian and his corporation Platinum Fighter Sales filed counterclaims seeking that relief for themselves, because a thief cannot convey good title, plus an order that Greenhill or Amphib hand the plane over to them. But the district judge concluded that the time to accuse Martin of theft had expired long ago. 2017 U.S. Dist. LEXIS 186706 (N.D. Ill. Nov. 13, 2017).

Although the judge's opinion states that plaintiffs are entitled to a declaratory judgment, the court did not enter one. Instead it entered this decision on the form used for judgments under Fed. R. Civ. P. 58:

> Judgment is entered in favor of Plaintiff and against Defendant on Plaintiffs' complaint for declaratory relief [1], and on Defendants' counterclaims for conversion and declaratory relief [14].

A document providing that "[j]udgment is entered" does not satisfy Rule 58. A judgment must provide the relief to which the prevailing party is entitled. See, e.g., *Hyland v. Liberty Mutual Fire Insurance Co.*, 885 F.3d 482 (7th Cir. 2018); *Cooke v. Jackson National Life Insurance Co.*, 882 F.3d 630 (7th Cir. 2018); *Reytblatt v. Denton*, 812 F.2d 1042 (7th Cir. 1987); *Azeez v. Fairman*, 795 F.2d 1296 (7th Cir. 1986). This document does not do that. It shows that the district court is done with the case, which permits an appeal, but it does not resolve the parties' dispute. The judgment also does not show that it

was reviewed and approved by the judge, although Rule 58(b)(2) provides that the judge, not a clerk, must approve decisions of this kind.

The district judge failed to resolve two subjects on which the parties' appellate briefs disagree. First, who receives the relief? The judgment refers to "Plaintiff", but there are two plaintiffs. The corporate plaintiff (Amphib) is the registered owner of the airplane, but some of the district court's opinion suggests that relief is being awarded to Greenhill. Second, although plaintiffs' initial complaint sought a declaratory judgment that they own the airplane against the world (a standard outcome of a quiet-title action), at oral argument on appeal they recognized that this suit concerns personal property rather than real estate and disclaimed entitlement to relief broader than a declaration that their rights are superior to Vartanian's. Neither the district court's opinion nor its judgment distinguishes these possibilities.

These shortcomings led us to remand the case with instructions to enter a proper declaratory judgment. The district court promptly complied. The revised judgment provides that Amphib owns the aircraft free of any claim by Vartanian. It does not insulate Amphib from other persons' potential claims or bestow any ownership rights on Greenhill. This eliminates two of the parties' appellate controversies but still requires us to address Vartanian's contention that the district court should have decided whether Martin stole the plane in or before 1984.

Although federal law provides a registration system for aircraft, state law supplies the rules for determining ownership. See 49 U.S.C. §44108(c)(1); *Shacket v. Philko Aviation, Inc.*, 841 F.2d 166, 169 (7th Cir. 1988). The district court ap-

plied Illinois law, and neither side has asked us to use the law of some other state. The district court classified Vartanian's claim as one for conversion, which is subject to a five-year period of limitations under 735 ILCS 5/13-205. Observing that Vartanian accused Martin of theft in 1985 and 2009, and was on the verge of suing in 2004, the judge concluded that the five-year period had long expired, which blocked Vartanian from contending that Amphib's title to the plane is derived from any theft by Martin.

Vartanian's appellate position incorporates elements of the discovery doctrine with elements of equitable estoppel. The discovery rule in Illinois provides that a period of limitations starts to run when the injured party "knows or reasonably should know" of the injury and its cause. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 414–16 (1981). Vartanian knew in 1985 that his Mustang had vanished; he suspected Martin from the outset and had plenty of time to investigate. Indeed, he *did* investigate, and in Illinois having enough information to start an investigation also starts the period of limitations. See *LaSalle National Bank v. Skidmore, Owings & Merrill*, 262 Ill. App. 3d 899, 902–04 (1994). Yet for more than 30 years, during which he complained to federal and state prosecutors, Vartanian did not commence civil litigation against Martin, Greenhill, or Amphib.

His current arguments have less to do with the discovery rule than with the doctrine of equitable estoppel (which Illinois calls fraudulent concealment)—the rule that a wrongdoer who actively tries to prevent suit cannot invoke the statute of limitations when suit finally comes. Playing games with serial numbers, and failing to admit wrongdoing, come within that doctrine, Vartanian asserts. Yet Vartanian knew

long ago what serial number Martin was using; he was not thrown off the scent. Illinois starts the period of limitations no later than actual discovery, even if the potential defendant tried unsuccessfully to conceal the offense. See 735 ILCS 5/13-215. And Illinois does not defer the limitations period until an admission of wrongdoing. See *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 182 (2011). That would effectively abolish all statutes of limitations, for wrongdoers rarely own up to their transgressions.

It does not help Vartanian to characterize the events as a continuing violation. The disappearance of his Mustang was a discrete event, and the fact that discrete wrongs have continuing consequences does not extend the time to sue. See, e.g., *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110–15 (2002); *Turley v. Rednour*, 729 F.3d 645, 654–55 (7th Cir. 2013) (concurring opinion); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 348–49 (2002). The statute of limitations expired long ago, just as the district court concluded.

That does not matter, Vartanian asserts, because even if he cannot pursue a conversion claim against Greenhill, Amphib cannot obtain any relief against him without proving that Martin is *not* a thief. Illinois would not apply a statute of limitations to a defense against a quiet-title action, Vartanian insists. We know from the district court's corrected judgment that this is not a quiet-title action (the court did not award Greenhill or Amphib rights against the world). What's more, having lost his conversion claim, Vartanian lacks any way to show that his rights are superior to Amphib's, the only matter resolved by the judgment the district court entered on remand.

Still more: Even if Illinois would not apply a statute of limitations, the doctrine of laches would remain. Between 1985 and the beginning of this suit Waterman Brown died, and the parties' inability to obtain his evidence would cause prejudice that is attributable to Vartanian's long delay. Four other potential witnesses died in the decades between 1985 and the filing of Vartanian's counterclaim; they might have addressed topics such as whether Vartanian abandoned the plane between 1965 and 1985. All of the principals (Vartanian, Greenhill, and Martin) are in their 80s and experiencing difficulty remembering events of decades ago. Important business records from the 1960s through the 1990s cannot be located. It is too late for the judicial system to make a reliable decision about what happened to Vartanian's plane (or parts of it) and which components of Greenhill's plane might be traced to the Mustang that the Royal Canadian Air Force sold as surplus in 1960.

AFFIRMED